# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**SHERRY L. HALL,**

                    **Plaintiff,**

**-vs-**                                   **Case No.  6:07-cv-1321-Orl-22KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

                    **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the Complaint filed by Sherry L. Hall, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. No. 6.

## I.     PROCEDURAL  HISTORY.

Hall applied for benefits for a period of disability and disability insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program ("OASDI"), 42 U.S.C. § 401, *et seq*., and for Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. §§ 1382, *et seq*. (sometimes referred to herein as the Act).  She alleged that she became disabled on November 12, 1996.  R. 105, 493. Hall's application was denied initially and on reconsideration. R. 54-56, 59-61, 497-504.

Hall requested a hearing before an administrative law judge (ALJ).  R. 63.  An ALJ held a hearing on January 21, 2003.  R. 43, 66.  Hall, represented by a non-attorney, testified at the hearing.  Juliana Z. Hey, a vocational expert (VE), also testified.  R. 43.[1] The ALJ issued an Unfavorable Decision on May 12, 2003.  R. 40-53.

Hall filed a Request for Review by the Appeals Council, which was granted and the matter was remanded to the ALJ with instructions.  R. 78, 80-83.  The ALJ conducted a supplemental hearing on June 17, 2004.  R. 505-32.  Hall, represented by the same non-attorney, testified again at the second hearing.  Walter Todorowski, VE, also testified.  *Id.*

The ALJ issued a Partially Favorable Decision on September 30, 2004.  R. 19-33. The ALJ found that Hall was disabled as of January 1, 2004, but not prior thereto.  R. 22. The ALJ found that Hall's earnings in 1999 and 2000 did not constitute substantial gainful activity. R. 23.

The ALJ concluded that the medical evidence showed that Hall had status post percutaneous transluminal coronary angioplasty, coronary artery bypass graft surgery, degenerative disc disease of the lumbar spine, status post lumbar laminectomy and fusion, a history of hypertension and diabetes mellitus.  R. 27.  Though severe, these impairments did not meet or equal any of the impairments listed in the applicable social

---

[1]  The transcript of this hearing is not in the record before the Court.

security regulations (the Listings).[2]  *Id*.  She also had a depressive disorder, which the ALJ determined resulted in only mild limitations in function.  *Id*.

The ALJ concluded that Hall had the residual functional capacity (RFC) prior to January 1, 2004, to lift 20 pounds occasionally with no repetitive bending and occasionally twisting and squatting, to stand/walk 4-5 hours a day and to sit 3-5 hours a day with no pushing or pulling exceeding 10 pounds.  R. 29.  After January 1, 2004, Hall had the RFC to lift less than 10 pounds occasionally and 10 pounds frequently, sit for less than 6 hours in a day, and stand/walk for less than 2 hours in a day.  *Id*.

In reaching this RFC conclusion, the ALJ gave considerable weight to the opinions of Dr. Goll, Dr. Haté, the reviewing physicians, and the functional capacity assessment from Blue Ridge Physical Therapy and Sport Medicine.  R. 28-29.  The ALJ gave some weight to the opinion of Dr. Geissele.  She gave little weight to the opinions of Dr. Gresham and Dr. Narula, finding them inconsistent with the opinions of other physicians and the record as a whole.  R. 29.  The ALJ also found Hall's claimed limitations prior to January 1, 2004, were not entirely credible and were exaggerated. R. 28.

The ALJ found that Hall was unable to return to her past relevant work.  R. 30. Based on the testimony of the VE, the ALJ found that there were jobs that existed in significant numbers in the national economy that Hall could have performed before

---

[2]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

January 1, 2004, given her age, education, work experience and RFC.  R. 30-31.

Therefore, the ALJ concluded that Hall was not disabled prior to January 1, 2004, but

has been disabled since January 1, 2004.  R. 31.

Hall requested review of the ALJ's decision. R. 14-18. On June 27, 2007, the

Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 10-

12. Hall timely sought review of this decision by this Court.  Doc. No. 1.

## II.      JURISDICTION.

As the plaintiff has exhausted her administrative remedies, the Court has

jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g),

as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.     STATEMENT OF FACTS.

Review of the entire record reflects that the facts are adequately stated in the

ALJ's decision and in the parties' memoranda.  Accordingly, I will only summarize the

pertinent facts to protect Hall's privacy to the extent possible.[3]

Hall was 49 years old at the time the ALJ's decision was issued.  R. 518-19.  She

attended school through the eleventh grade.  R. 519.

Hall injured her back in a work-related accident in 1996.  R. 187, 243.  She was

diagnosed with acute lumbosacral strain.  R. 188.  From November 18, 1996 through

December 12, 1996, she was treated at Pine Castle Treatment Center. R. 180-85.

---

[3]  Because Hall does not challenge the findings of the ALJ regarding her mental
impairment, I will not review the medical records regarding that impairment.

Stephen R. Goll, M.D.[4] , began treating Hall in January 1997.  R. 243.  At that time, she complained of moderate to severe back pain radiating to her right leg with occasional numbness and tingling.  R. 243.  Dr. Goll's impression after examination was that Hall had lumbar radiculopathy.  R. 241.  A discography performed on April 22, 1997, revealed a disc bulge with mild stenosis at L3-4, and a disc bulge at L4-5 with moderate stenosis.  R. 236.  Hall's symptoms included right leg pain and low back pain.  *Id*. Dr. Goll's diagnosis was lumbar degenerative disc disease with spinal stenosis and radiculopathy.  R. 191, 235.  Dr. Goll indicated on April 29, 1997, that Hall could return to work with light duty restrictions as previously assigned while she awaited surgery. R. 234.

On January 6, 1998, Dr. Goll performed spinal surgery on Hall involving a laminectomy and fusion.  R. 191-92, 229. The post-operative diagnosis was spinal stenosis L4-5 with degenerative disk disease L4-5.  R. 191.  Hall was not permitted to work following the surgery.  R. 227.

On April 8, 1998, Dr. Goll opined that Hall could perform sedentary work with no lifting greater than 10-15 pounds and with no repetitive bending. R. 226.  On July 24, 1998, Dr. Goll modified Hall's restrictions due to continued back pain.  R. 225.  He limited her to lifting 20 pounds; no repetitive bending and occasional twisting or squatting; 4-6 hours per day of total standing and walking; 3-5 hours per day of total sitting and driving; no contraindications to foot/hand controls; and no pushing/pulling greater than 10 pounds. *Id*.

---

[4] The ALJ erroneously refers to Goll as "Gold" in her decision.  R. 24.

Hall was first treated for chest pain when she was hospitalized for five days in August 1998.  R. 210-16.  Curtis J. Weaver, M.D., diagnosed Hall with coronary artery disease (CAD) with unstable angina, severe stenosis (85-99% occlusion) of her left anterior descending (LAD) artery, hypertension, and hypercholesterolemia.  R. 211. Dr. Weaver performed a percutaneous transluminal coronary angioplasty and inserted two stents in the LAD.  R. 211-12.  A post-surgery angiography showed that both critical lesions in the LAD were resolved to 0%.  R. 212.  At a reevaluation on September 29, 1998, Hall reported a little tiredness but no pain.  R. 217.  Dr. Weaver determined that her condition was stable. He noted that she would have slight limitations of physical activity. *Id*.

On February 4, 1999, Hall presented herself at the Watauga Medical Center Emergency Room with complaints of back pain.  R. 302-04.  She was prescribed medication and discharged.  R. 303.

Dr. Alfred Geissele saw Hall for evaluation of her back pain.  R. 221-23, 446.  At the initial evaluation on March 5, 1999, Hall reported that she felt better for about a month after her surgery, but then noted a return of worsening back pain symptoms. R. 222.  Dr. Geissele noted during a physical examination that Hall walked with a normal gait although she was somewhat slow and shuffled her feet; her knee and ankle reflexes were diminished.  Dr. Geissele was not sure, after review of x-rays, that Hall's spinal fusion was solid.  Dr. Geissele discussed two treatment options with Hall – one surgical, the other conservative treatment with physical therapy and pain medications.  R. 223. Hall chose to proceed with the conservative treatment.  R. 221.  Dr. Geissele referred her

to physical therapy for work conditioning with a functional capacity evaluation (FCE) and continuing pain management through Watauga Medical Center.  *Id*.

Hall received physical therapy treatment through Blue Ridge Physical Therapy from May 24, 1999 through August 23, 1999.  R. 244-48.  On August 5, 1999, Alex S. Arab, P.T. Certified Evaluator, determined that Hall was capable of performing work at the "sedentary-light" RFC with occasional torso lifting of 10 pounds, occasional leg lifting of 15 pounds, the ability to spend 1/3-2/3 of her day sitting, standing, walking, and reaching, the ability to spend less than 1/3 of her day kneeling or crawling, and no bending or climbing.  R. 244-45.

Hall continued her pain management treatment at the Watauga Medical Center through December 9, 1999.  R. 249-303. In May 1999, she complained to Daniel H. Nguyen, M.D., of moderately severe pain in her left buttock radiating down the posterior of her leg.  R. 289.  She complained that standing and walking gradually increased the pain.  *Id*.  On examination, there was no upper back, spinal or muscle pain, but there was significant tenderness to palpation of the sacroiliac joint, left greater than right.  R. 290. Dr. Nguyen also found significant paravertebral tenderness bilaterally.  Given Hall's lack of response to conservative therapy, he planned a trial of epidural steroid injections.  *Id*. On May 28, 1999, Dr. Nguyen noted that Hall did not improve with epidural injections and he decided to proceed with facet joint injections.  R. 279.

On July 8, 1999, Dr. Goll found that Hall had reached maximum medical improvement for her chronic lumbar degenerative spine condition and assessed a 13% permanent impairment rating for workers' compensation purposes.  R. 224.  Dr. Goll

opined that Hall was restricted from lifting more than 20 pounds, she could not engage in repetitive bending, she could not push/pull more than 10 pounds, and she could only occasionally twist or squat. *Id*.

On August 31, 1999, Hall sought treatment in the Watauga Medical Center Emergency Room for left-sided chest pain. R. 261-62.  On October 23, 1999, Hall returned to the emergency room complaining of left-sided headache with nausea and vomiting. R. 258.

At Dr. Geissele's final evaluation on October 27, 1999, Hall reported that the facet block injections would work for only 1-2 days and then there was no notable change. She remained on pain medication.   Dr. Geissele opined that Hall had reached maximum medical improvement without surgery and determined that she had a 12% permanent partial impairment of her whole person pursuant to workers' compensation guidelines. R. 446.

Hall returned to Watauga Medical Center on May 5, 2000, with complaints of intermittent chest pain for the previous 24 hours in her substernal area and radiating to her bilateral upper extremities.  R. 313. She was transferred from Watauga to the Carolinas Medical Center on May 8, 2000, due to continued chest pain, There, she underwent an urgent cardiac catheterization related to unstable angina.  R. 328.  Testing revealed a 90% stenosis of the LAD, which lead to placement of a single cardiac stent. R. 328-29.

Less than one month later, Hall reported to The Sanger Clinic on June 2, 2000, where she was seen by Hal P. Blanks, M.D. She presented with essentially no

complaints except for occasional substernal chest discomfort when she lifted her left arm.  R. 334.  Her electrocardiogram revealed no acute abnormalities.  R. 335. Dr. Blanks adjusted her medications due to her blood pressure.  R. 336.

On October 16, 2000, Hall was admitted to Florida Hospital with complaints of chest pain.  R. 338-51.  Hall rated her pain as an 8 out of 10 pain level, and dull and heavy in the bilateral chest and the top of her shoulders. R. 344.  The diagnostic impression was CAD, but probably not angina, and hypertension.  R. 347.  Her EKG was essentially normal. R. 349.  A chest x-ray also was normal.  R. 351.  She was referred to Dr. Weaver for follow-up.  R. 347.

From September 19, 2000 through May 7, 2002, Hall received medical care from the Health Care Center for the Homeless (the "Center"), which is part of the Orange County Medical Clinic. R. 380-438.  On November 16, 2000 and December 15, 2000, Hall complained of back pain.  R. 400, 403.

Nitin Haté, M.D., conducted a consultative physical examination on December 7, 2000.  R. 352-55A. Hall complained of back pain radiating into her left leg sometimes with tingling.  She also reported occasional chest pain sometimes radiating into her arms. Finally, she had diabetes mellitus since October 2000, which was controlled by medication.  R. 352.  The neurological examination was unremarkable with no localized signs.  R. 354.  Hall reported pain, particularly with stooping. R. 353.   Straight-leg raising was restricted on the left side and range of motion was somewhat restricted in the thoracolumbar region.  R. 354.  Dr. Haté opined that Hall would have difficulties in

repetitive stooping, and in lifting greater than 10 pounds frequently and 20 pounds occasionally. *Id*.

On January 24, 2001, Violet A. Stone, M.D., completed a Physical RFC Assessment. R. 356-63. Dr. Stone opined that Hall could lift up to 20 pounds occasionally and up to 10 pounds frequently. R. 357. Further, Hall could stand/walk about 6 hours in an 8-hour work day and sit for about 6 hours in an 8-hour work day. *Id*. She further was limited to only occasional stooping and crouching. R. 358.

An MRI of the lumbar spine on January 10, 2001, revealed a small to moderate sized left lateralized disc protrusion at L3-4 and an annular bulging disc with facet joint arthropathic changes at this level causing moderate spinal stenosis. R. 413. The MRI report further noted annular disc bulging at L5-S1 without spinal stenosis; a subtle bone lesion was also noted at L2. *Id*.

On June 14, 2001, Hall reported that her low back pain had worsened. R. 395. Hall further reported that while physical therapy helped her neck, it did not help her back. *Id*.

Michael J. Broom, M.D., examined Hall on July 23, 2001. She complained of constant low back pain radiating into her left leg, increasing with bending, lifting, twisting, standing or sitting for a while, getting into and out of a car or chair, and lying in bed. On examination, Dr. Broom noted tenderness without spasm, and a straight-leg raising test confirmed back and left leg pain. R. 456. Dr. Broom prescribed pain medication and referred Hall to Marc R. Gerber, M.D., for pain management. R. 455.

On July 25, 2001, Jack L. Gresham, M.D., conducted a consultative physical examination.  R. 365-68.  On examination, Dr. Gresham noted that Hall stood erect with normal posture, walking with a slightly measured gait and used no assistive device. R. 365.  Her spinal alignment was normal.  She was able to bend forward at the waist to 30° before complaining of pain.  There was no localized muscle spasm, but her lower lumbar spine was tender to palpation.  She was able to stand on her toes without difficulty.  She could perform a straight leg raise from a sitting position with her right leg, but only to 60°with her left leg.  Deep tendon reflexes were hypoactive in both lower extremities. Otherwise, she had no neurologic deficit.  There was no neurologic deficit in either upper extremity, with good grip strength and normal manual dexterity to all fingers. *Id*.  Dr. Gresham opined that Hall's back problem would not be aided by any further treatment.  R. 366.  Dr. Gresham diagnosed (i) postlaminectomy syndrome with probable lumbar arachnoiditis[5], (ii) degenerative disc disease of the lower lumbar spine, and (iii) CAD by history. *Id*.  He further opined that Hall was disabled "to some degree" because of her CAD.  *Id*.  Dr. Gresham concluded that Hall was not a candidate for any type of regular gainful employment. *Id*.

────────────────

[5] "Arachnoiditis is a debilitating condition characterized by severe stinging and burning pain and neurologic problems. It is caused by an inflammation of the arachnoid lining – one of the 3 linings that surround the brain and spinal cord. This inflammation causes constant irritation, scarring, and binding of nerve roots and blood vessels. The predominant symptom of arachnoiditis is chronic and persistent pain in the lower back, lower limbs or, in severe cases, throughout the entire body." *Arachnoidits*, found online at http:// www.spineuniverse.com/displayarticle.php/article180.html (last visited July 15, 2008).

On August 7, 2001, M. de la Cerna, M.D., completed a Physical RFC Assessment. R. 370-77.  Dr. de la Cerna opined that Hall could lift up to 20 pounds occasionally and up to 10 pounds frequently.  R. 371.  Further, Hall could stand/walk about 2 hours and sit for about 6 hours in an 8-hour work day.  *Id*.  She further was limited to only occasional climbing, balancing, stooping, kneeling, crouching and crawling.  R. 372.

Dr. Gerber[6] provided pain management care from August 28, 2001 through May 28, 2002.  R. 447-56. At her visit on August 28, 2001, Hall reported that 2-3 Vicodin per day did not provide sufficient relief and she requested stronger medication.  R. 453. Dr. Gerber noted that Hall's lumbar flexibility was mild to moderately limited in all planes. *Id.*  She exhibited some increased leg pain with straight leg raising, more on the left than right, but no acute radicular symptoms.  R. 452-54.  Her reflexes were intact and symmetrical.  R. 454.  Palpation did not produce any acute trigger points, but she complained of generalized low back pain with range of motion and physical activities such as prolonged standing or sitting.   Dr. Gerber prescribed Roxicodone for pain and a muscle relaxer. *Id*.

Hall was admitted to the hospital on October 6, 2001, for chest pain and was discharged on October 10, 2001.  R. 388.  She was directed to follow up with Florida Hospital South for continued care. *Id*.

On October 30, 2001, Hall showed no significant change from her prior examination.  R. 450.  Dr. Gerber adjusted Hall's medications to include MS Contin as

---

[6] The ALJ's decision refers to treatment by Dr. Michael Broom, who works with Dr. Gerber.  A review of the records, however, indicate that except for the initial evaluation, it was Dr. Gerber who provided treatment.

Percocet and Vicodin only provided mild relief.  *Id*.  At her visit on November 27, 2001,

Dr. Gerber noted that Hall was doing better on MS Contin, although she asked for a

higher dose to obtain better pain relief. She was able to walk without an assistive device,

but she still had significant limitations in range of motion.  R. 449. On December 27,

2001, Hall reported that she was able to do more activity and she felt much less chronic

pain and no acute pain.  R. 448.  Hall reported that the medication caused some nausea,

which Dr. Gerber hoped would resolve soon.  *Id*.

On January 31, 2002, Hall reported that she generally felt well except for her

chronic back pain. R. 386.  On April 9, 2002, Hall requested that the Center provide a

referral to an orthopaedist for her chronic back pain. R. 383.

On May 2, 2002, J.S. Kim, M.D., F.A.C.C., saw Hall for chest pain.  R. 378-79.

Hall reported frequent chest pain for two months, which worsened with heavy exertion.

R. 378.  The pain was relieved by her use of sublingual nitroglycerin. *Id*.  Dr. Kim

adjusted Hall's medications and recommended that a stress test be administered.

R. 379.

Dr. Gerber saw Hall again on May 28, 2002, at which time he noted that she was

doing "fairly well" but that she continued to report back pain, more on the left side than

right side.  R. 447.  On that date, Dr. Gerber provided a trigger point injection in her

lumbosacral region, and advised Hall to continue her same medications.  *Id*.

On February 26, 2003, Geeta Narula, M.D., performed a consultative physical

examination.  R. 439-44.  Dr. Narula noted that Hall could stand on her heels and toes

with difficulty; that she could not stand on one leg at a time; and that she had an antalgic

gait and used a walker for ambulation. R. 439.  Dr. Narula noted lumbar paraspinal muscle spasm and tenderness on examination, with limitation in range of motion. Dr. Narula's diagnostic impression included (i) failed laminectomy syndrome with chronic back pain; (ii) CAD status post stents; (iii) diabetes mellitus; and (v) hypertension. R. 439.  Dr. Narula opined that Hall's medications would effect her cognitive abilities.  *Id.* He further opined that Hall could not do any occupations that required lifting, carrying, prolonged sitting, standing, climbing or crawling.  *Id*.  Specifically, Dr. Narula concluded that Hall could sit less than 6 hours in an 8-hour workday, stand for less than 2 hours in an 8-hour workday, lift only 10 pounds occasionally and less than 10 pounds frequently, could never climb, balance, kneel, crouch or crawl, and could only occasionally stoop. R. 441-42.

On July 15, 2003, Hall complained of intermittent chest pain which was relieved with nitroglycerin.  R. 481.  She was referred to cardiology.  *Id*.

On November 7, 2003, Hall again complained of angina pain when she was "stressed out."  R. 475.  She was again referred to cardiology.  *Id*.

On January 8, 2004, Hall requested refills of her medications, which were approved.  R. 474.  On March 24, 2004, Hall reported dizziness for four days and having passed out for two hours the day before.  She complained of chest tightness. R. 471.

On April 7, 2004, James H. Tarver, M.D., diagnosed Hall with unstable, progressive angina. R. 458.  She underwent surgery with a quintuple bypass of various coronary arteries. R. 462. She was discharged but required to use oxygen.  *Id*.  As of the date of the hearing on June 17, 2004, she was still on oxygen.  R. 508-09.

## IV.     STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3); 42 U.S.C. § 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.   ANALYSIS.

Hall argues that the ALJ's determination that her disability began on January 1, 2004, was not based on substantial evidence.  Hall further argues that the ALJ erred in failing to obtain the services of a medical advisor to determine the onset date of her disability.

-17-

Social Security Ruling 83-20 addresses the determination of the disability onset date of slowly progressive impairments. It provides as follows:

> The medical evidence serves as the primary element in the onset
> determination. Reports from all medical sources (e.g., physicians,
> hospitals, and government agencies) which bear upon the onset date
> should be obtained to assist in determining when the impairment(s)
> became disabling.
>
> With slowly progressive impairments, it is sometimes impossible to obtain
> medical evidence establishing the precise date an impairment became
> disabling. Determining the proper onset date is particularly difficult, when,
> for example, the alleged onset and the date last worked are far in the past
> and adequate medical records are not available. In such cases, it will be
> necessary to infer the onset date from the medical and other evidence that
> describe the history and symptomatology of the disease process. . . .
> How long the disease may be determined to have existed at a disabling
> level of severity depends on an informed judgment of the facts in the
> particular case. This judgment, however, must have a legitimate medical
> basis. At the hearing, the administrative law judge (ALJ) should call on the
> services of a medical advisor when onset must be inferred. If there is
> information in the file indicating that additional medical evidence
> concerning onset is available, such evidence should be secured before
> inferences are made.

Soc. Sec. R. 83-20, 1983 WL 31249 at 2-3 (Nov. 30, 1982).

There is no dispute that Hall's back and heart ailments were slowly progressive impairments.  As of December 7, 2000, Dr. Haté concluded that Hall could perform some work activities with limitations in lifting and repetitive stooping.  Thereafter, an MRI revealed that Hall had bulging discs with moderate spinal stenosis, and she was hospitalized for chest pain.  The medical evidence supports the conclusion that Hall was in significant pain based on the strong pain medication prescribed by Dr. Gerber. Throughout this time, Hall sought treatment for chest pain and related symptoms.  Dr. Gresham subsequently opined that Hall could not perform regular gainful employment.

As of February 26, 2003, Dr. Narula opined after examining Hall that she could perform less than a full range of sedentary work.   On April 7, 2004, Hall had quintuple coronary bypass surgery.

The ALJ stated that she gave less weight to the opinions of Drs. Gresham and Narula because she found them inconsistent with the opinions of Drs. Goll and Geissele. Yet, Dr. Goll had not examined Hall since July 1999, and Dr. Geissele last examined Hall in October 1999.  As such, their opinions did not include an assessment of Hall's condition in 2000 and later.  Even if the ALJ's decision not to credit the RFC opinions of Drs. Gresham and Narula is supported by the record, the ALJ was required to cite another "legitimate medical basis" for the disability onset date she selected or call upon a medical advisor to render an opinion regarding the disability onset date.  *See Miller v. Comm'r*, No. 07-14698, 2008 WL 2302498, at *1 (11th Cir., June 3, 2008).  She did not do so.

The Commissioner argues that the ALJ relied on the residual weakness and fatigue from Hall's heart surgery to establish the January 1, 2004, disability onset date. However, the heart surgery to which the Commissioner refers was performed in April 2004, not January 2004.  Thus, even under the Commissioner's argument, the January 1, 2004, date appears to have been arbitrarily selected.

In *Volley v. Astrue*, No. 1:07-cv-138-AJB, 2008 WL 822192 (N.D. Ga., March 24, 2008), the court considered Ruling 83-20 in the context of a social security disability application in which the medical evidence did not clearly establish a disability onset date arising from slowly progressive impairments. The court's review of the case law revealed

that while the Eleventh Circuit had not addressed when an ALJ was required to obtain the advice of a medical expert under Ruling 83-20, other courts had held that a medical expert should be used "if the medical record is ambiguous or otherwise inadequate to make a determination of the onset date." *Id.* at * 13.  Finding the medical evidence ambiguous as to the disability onset date, the *Volley* court reversed the Commissioner's decision and remanded the case to obtain the advice of a medical expert regarding the plaintiff's disability onset date.

I find the *Volley* court's analysis to be persuasive.  In the present case, the ALJ's rejection of the RFC opinions of Drs. Gresham and Narula left an inadequate basis in the medical records to determine when Hall's impairments rendered her disabled. Accordingly, the ALJ should have consulted a medical expert to render an opinion regarding the disability onset date. As such, remand is required for further proceedings.

### VI.   RECOMMENDATION.

For the reasons set forth in the foregoing report, I respectfully recommend that the decision of the Commissioner be **REVERSED** and the case be **REMANDED** for further proceedings.  I further recommend that after the Court enters its decision on this Report and Recommendation, it direct the Clerk of Court to enter a judgment and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an

aggrieved party from attacking the factual findings on appeal.

      Recommended in Orlando, Florida on July 15, 2008.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy